Robert C. Moest, Of Counsel, SBN 62166
**THE BROWN LAW FIRM, P.C.**
2530 Wilshire Boulevard, Second Floor
Santa Monica, CA 90403
Telephone: (310) 915-6628
Facsimile: (310) 915-9897
Email: RMoest@aol.com

*Counsel for Plaintiff*

[Additional Counsel on Signature Page]

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GREG HANOWSKI, derivatively on behalf of ENPHASE ENERGY, INC., <br><br> Plaintiff, <br><br> v. <br><br> BADRINARAYANAN KOTHANDARAMAN, RAGHUVEER BELUR, STEVEN J. GOMO, JAMIE HAENGGI, BENJAMIN KORTLANG, JOSEPH MALCHOW, RICHARD MORA, and THURMAN JOHN RODGERS, <br><br> Defendants, <br><br> and <br><br> ENPHASE ENERGY, INC., <br><br> Nominal Defendant. | Case No.: <br><br> **DEMAND FOR JURY TRIAL** <br><br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |

Verified Shareholder Derivative Complaint

## INTRODUCTION

Plaintiff Greg Hanowski ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of nominal defendant Enphase Energy, Inc. ("Enphase" or the "Company"), files this Verified Shareholder Derivative Complaint against defendants Badrinarayanan Kothandaraman ("Kothandaraman"), Raghuveer Belur ("Belur"), Steven J. Gomo ("Gomo"), Jamie Haenggi ("Haenggi"), Benjamin Kortlang ("Kortlang"), Joseph Malchow ("Malchow"), Richard Mora ("Mora"), and Thurman John Rodgers ("Rodgers") (collectively, the "Individual Defendants," and together with Enphase, "Defendants") for breaches of their fiduciary duties as directors and/or officers of Enphase, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, for violations of Sections 14(a), 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and against Defendants Kothandaraman and Belur for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Enphase, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action that seeks to remedy wrongdoing committed by the Individual Defendants from April 25, 2023 through October 22, 2024, inclusive (the "Relevant Period").

Verified Shareholder Derivative Complaint

2.      Enphase is a global energy technology company founded in March 2006 which purports to "design, develop, manufacture and sell home energy solutions that manage energy generation, energy storage and control and communications on one intelligent platform."[1] In recent years, the Company has transitioned from solar only systems to complete energy management solutions, which consist of "solar, batteries, load control, electrical vehicle ('EV') charging, compatibility with third-party generators, and grid services."[2] The Company has represented that "[t]his transition has contributed to the rising global interest in the full electrification of homes and businesses through renewable sources of energy."[3]

3.      Recently, Enphase has expanded its operations globally, causing the Company's revenue from international markets to grow substantially. Indeed, international revenue accounted for approximately 20%, 24%, and 36% of Enphase's total net revenues in fiscal years 2021, 2022, and 2023, respectively.

4.      In recent years, including before the start of the Relevant Period, the European markets for solar products have experienced widespread disruption. Notably, Chinese solar companies have flooded the market for solar inverters by selling or "dumping" their products at prices far lower than market averages, allowing suppliers from China to take substantial shares of the market.  For example, *Reuters* reported on data from the International Energy Agency which depicted that, in some cases, up to 95% of solar panels and parts installed in the European Union in 2023 came from China.[4]

5.      During the Relevant Period, the Individual Defendants repeatedly misled investors regarding competitive threats that Enphase was facing in the European solar inverter markets, continuously representing that, despite competition from cheaper Chinese

---

[1] https://www.sec.gov/ix?doc=/Archives/edgar/data/1463101/000146310124000024/enph-20231231.htm
[2] *Id.*
[3] *Id.*
[4] *See* Kate Abnett and Nina Chestney, *With solar industry in crisis, Europe in a bind over Chinese imports*, REUTERS, Feb. 6, 2024, https://www.reuters.com/business/energy/with-solar-industry-crisis-europe-bind-over-chinese-imports-2024-02-06/.

Verified Shareholder Derivative Complaint

alternatives, the Company had "the ability to demand the premium" in its European pricing strategies.

6.     The truth began to emerge after the market closed on October 26, 2023, when Enphase reported an approximately 34% quarter-over-quarter decline in European revenue in the third quarter of 2023 caused by "softening in demand." During an earnings call Enphase hosted the same day to discuss these results, Defendant Kothandaraman emphasized that, despite these competitive headwinds, Enphase would not be altering its strategy for pricing, stating that "there's no broad-based pricing adjustment from us."

7.     On this news, the price per share of the Company's stock fell $14.09, or approximately 15%, from a closing price of $96.18 per share on October 26, 2023 to close at $82.09 per share on October 27, 2023.

8.     The truth regarding the Company's competitive positioning in Europe fully emerged on October 22, 2024 when the Company announced its financial results for the third quarter of 2024, revealing, *inter alia*, an approximately 15% quarter-over-quarter decline in European revenue as a result of "further softening in European demand." However, during an earnings call Enphase hosted the same day to discuss these results, Defendant Kothandaraman emphasized that Enphase was "not dropping pricing anywhere" despite consistent competitive headwinds.

9.     On this news, the price per share of the Company's common stock fell $13.76, or approximately 15%, from a closing price of $92.23 per share on October 22, 2024 to close at $78.47 per share on October 23, 2024.

10.     Analysts responded negatively to these disclosures, with Guggenheim downgrading the Company's stock from a neutral rating to a sell rating and reporting that Enphase was "losing share to Chinese competitors who are willing to sell at less than half [Enphase]'s level."

11.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing

4

Verified Shareholder Derivative Complaint

public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) Enphase was facing competitive threats in the European solar inverter market, particularly due to pressure from suppliers in China; (2) due to the foregoing, Enphase could not maintain a sound pricing strategy; and (3) the foregoing factors would have a material detrimental impact on the Company's financial statements. Specifically, the Individual Defendants systematically overstated Enphase's ability to maintain its pricing levels and market share for microinverter products in Europe given competition from low-cost alternatives. As a result of the foregoing, the Company's statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

12. During the Relevant Period, the Individual Defendants further breached their fiduciary duties by causing Enphase to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations and material omissions. Indeed, during the Relevant Period, approximately 4.9 million shares of Enphase's common stock were repurchased, costing the Company over $601.6 million. As the Company's stock was actually worth only $78.47 per share, the price at which it was trading when markets closed on October 23, 2024, the Company overpaid for repurchases of its own stock by *over $210 million* in total.

13. The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact, while, during the Relevant Period, three of the Individual Defendants sold shares of Company common stock at inflated prices for combined total proceeds of *approximately $49.3 million*.

14. Additionally, in breach of their fiduciary duties, the Individual Defendants, during the Relevant Period, caused the Company to fail to maintain adequate internal

Verified Shareholder Derivative Complaint

controls.

15.     In light of the Individual Defendants' misconduct—which has subjected the Company, its President and Chief Executive Officer ("CEO"), and its Chief Products Officer ("CPO") to a federal securities fraud class action lawsuit pending in the United States District Court for the Northern District of California (the "Securities Class Action"), and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

16.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

17.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and of Defendant Kothandaraman's and Defendant Belur's liability in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors ("Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1), SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder, and Section 21D of the Exchange

Verified Shareholder Derivative Complaint

Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

19. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

20. This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

21. Venue is proper in this District because Enphase's principal executive offices are in this District. In addition, a substantial portion of the transactions and wrongs complained of herein occurred in this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

22. Plaintiff is a current shareholder of Enphase. Plaintiff has continuously held Enphase common stock at all relevant times.

### Nominal Defendant Enphase

23. Enphase is a Delaware corporation with its headquarters at 47281 Bayside Parkway, Fremont, California 94538. Enphase's common stock trades on the Nasdaq Global Market ("NASDAQ") under the ticker symbol "ENPH."

### Defendant Kothandaraman

24. Defendant Kothandaraman has served as President and CEO of Enphase and as a Company director since September 2017. Previously, he served as the Company's Chief Operating Officer ("COO") from April 2017 to September 2017. According to the Schedule 14A the Company filed with the SEC on April 4, 2024 (the "2024 Proxy Statement"), as of March 19, 2024, Defendant Kothandaraman beneficially owned 1,584,696 shares of the Company's common stock, representing 1.2% of the Company's total outstanding stock. Given that the price per share of the Company's common stock at

the close of trading on March 19, 2024 was $109.16, Defendant Kothandaraman owned approximately $172,985,415 worth of Enphase stock as of that date.

25. For Fiscal Year 2023, Defendant Kothandaraman received $19,527,534 in compensation from the Company, including $450,000 in salary, $18,804,672 in stock awards, $270,750 in non-equity incentive plan compensation, and $2,112 in all other compensation.

26. The 2024 Proxy Statement stated the following about Defendant Kothandaraman:

Key Skills and Qualifications

- Mr. Kothandaraman brings to the Board strong technical, operational, strategy and leadership experience during his 21-year career at Cypress Semiconductor and his tenure at Enphase.

Career Highlights

- Mr. Kothandaraman, 52, joined Enphase in April 2017 as Chief Operating Officer ("COO"), before being appointed President and CEO and a member of the Board in September 2017. Prior to Enphase, Mr. Kothandaraman served as Executive Vice President of the Data Communications Division of Cypress Semiconductor Corporation, a semiconductor design and manufacturing company, from April 2011 to September 2016. He started his career with Cypress Semiconductor in 1995 and worked in process technology development and chip design before becoming Vice President of the Asynchronous SRAM Business in 2008. Mr. Kothandaraman was subsequently promoted to executive vice president of Cypress's Data Communications Division in November 2011 and spent the next five years building the USB 3.0, USB-C and the Internet of Things businesses. He also served as the Executive Director of Cypress Semiconductor Technology India Private Limited from 2012 to 2016.

- Mr. Kothandaraman received his bachelor of technology degree from IIT Madras and a master of science degree in materials science from the University of California, Berkeley. Mr. Kothandaraman attended the Stanford Executive Program in 2008 and holds eight U.S. patents.

**Defendant Belur**

8

Verified Shareholder Derivative Complaint

27.     Defendant Belur is a co-founder of the Company and has served as the Company's Senior Vice President and CPO at all relevant times.

28.     The Company's website states the following about Defendant Belur:

Raghu co-founded Enphase Energy with Martin Fornage in 2006.

He has more than 25 years of experience in the clean energy and high-technology industries, and has been at the forefront of developing Enphase's leading integrated energy system—with solar generation, storage, monitoring, and control. Prior to Enphase, Raghu developed high-speed optical communication technology for Cerent, which was later acquired by Cisco Systems. Before Cerent, Raghu was an engineer at the Indian Institute of Science, where he played a key role in the development of an alternative energy gasification system.

Raghu received an M.S. degree in electrical engineering from Texas A&M University and an M.B.A. degree from the Haas School of Business at U.C. Berkeley.

**Defendant Gomo**

29.     Defendant Gomo has served as a Company director since March 2011. He has also served as Chair of the Board since October 2022 and serves as Chair of the Audit Committee. According to the 2024 Proxy Statement, as of March 19, 2024, Defendant Gomo beneficially owned 138,773 total shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 19, 2024 was $109.16, Defendant Gomo owned approximately $15,148,460 worth of Enphase stock as of that date.

30.     For Fiscal Year 2023, Defendant Gomo received $374,991 in compensation from the Company. This included $105,000 in fees earned or paid in cash and $269,991 in stock awards.

31.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Gomo made the following sales of Company common stock:

| Date | Number of | Avg. | Proceeds |
| --- | --- | --- | --- |

Verified Shareholder Derivative Complaint

|  | Shares | Price/Share |  |
|---|---|---|---|
| 2024-04-25 | 20,000 | $105.62 | $2,112,400 |
| 2024-04-26 | 25,000 | $110.45 | $2,761,150 |

Thus, in total, before the fraud was exposed, he sold 45,000 shares of Company common stock on inside information, for which he received approximately $4.9 million in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

32.     The 2024 Proxy Statement stated the following about Defendant Gomo:

Key Skills and Qualifications

- Mr. Gomo brings to the Board valuable financial and business expertise through his years of experience as a chief financial officer with publicly traded companies. Mr. Gomo provides an important role in leading the Board's activities on financial and auditing matters, as well as collaborating with our independent registered public accounting firm and management team in these areas.

Career Highlights

- Mr. Gomo, 72, served as Executive Vice President of Finance and CFO of NetApp Inc., a computer storage and data management company, from October 2004 until December 2011, and as Senior Vice President of Finance and CFO from August 2002 until October 2004. From November 2000 to April 2002, Mr. Gomo served as CFO of Gemplus International S.A., a smart card provider, and from February 1998 until August 2000, Mr. Gomo served as CFO of Silicon Graphics, Inc., a high-performance computer and computer graphics company. Prior to February 1998, Mr. Gomo held various finance, financial management, manufacturing, and general management positions at Hewlett-Packard Company, an information technology company.

- Mr. Gomo holds a bachelor of science degree in business administration from Oregon State University and a master of business administration degree from Santa Clara University.

- From February 2005 to May 2017, Mr. Gomo served on the Board of Directors of SanDisk Corporation, a designer, developer and manufacturer of flash storage solutions. From December 2020 through July 2021, Mr.

Verified Shareholder Derivative Complaint

Gomo served on the Board of Directors of Rodgers Silicon Valley Acquisition Corp, a special purpose acquisition company that successfully completed a business combination with Enovix Corporation.

Current Public Company Boards

- Nutanix, Inc. – since June 2015
- Micron Technology, Inc. – since October 2018

**Defendant Haenggi**

33.     Defendant Haenggi has served as a Company director since August 2020. She also serves as a member of the Nominating and Corporate Governance Committee. According to the 2024 Proxy Statement, as of March 19, 2024, Defendant Haenggi beneficially owned 7,602 total shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 19, 2024 was $109.16, Defendant Haenggi owned approximately $829,834 worth of Enphase stock as of that date.

34.     For Fiscal Year 2023, Defendant Haenggi received $314,852 in compensation from the Company. This included $65,000 in fees earned or paid in cash and $249,852 in stock awards.

35.     The 2024 Proxy Statement stated the following about Defendant Haenggi:

Key Skills and Qualifications

- Ms. Haenggi's extensive experience in consumer and commercial sales, marketing and customer experience brings a valuable perspective to the Board.

Career Highlights

- Ms. Haenggi, 54, has served as the President of ADT Solar, a division of ADT Security Services, a smart-home security provider, since December 2022. She previously served as the Executive Vice President, COO at ADT Solar, overseeing sales, marketing contract center, field and business operations, HR, IT and administration. Prior to that, Ms. Haenggi was the Executive Vice President, Chief Customer Officer at ADT Security Services from July 2018 to March 2022. She joined ADT in 2016 as Senior Vice President, Chief Sales and Marketing Officer and had previously been with the company from 1998 to 2006 with progressive senior leadership

11

Verified Shareholder Derivative Complaint

roles in commercial sales and marketing, and domestic and international sales and marketing. From 2010 to 2016, Ms. Haenggi was the Chief Customer Experience Officer at Protection 1, Inc., a home security systems company. Previously, she was at Vonage, Inc. from 2006 to 2010 as the Chief Marketing Officer and Vice President of Customer Experience. Earlier in her career, Ms. Haenggi held various sales and marketing roles at Holmes Protection Group and National Guardian Corporation.

- Ms. Haenggi earned a bachelor of arts degree in international relations and Japanese from the University of Minnesota and received an honorary doctorate from Taylor University.

**Defendant Kortlang**

36.     Defendant Kortlang has served as a Company director since May 2010. He also serves as a Chair of the Nominating and Corporate Governance Committee and as a member of the Audit Committee. According to the 2024 Proxy Statement, as of March 19, 2024, Defendant Kortlang beneficially owned 209,443 total shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 19, 2024 was $109.16, Defendant Kortlang owned approximately $22,862,798 worth of Enphase stock as of that date.

37.     For Fiscal Year 2023, Defendant Kortlang received $334,852 in compensation from the Company. This included $85,000 in fees earned or paid in cash and $249,852 in stock awards.

38.     The 2024 Proxy Statement stated the following about Defendant Kortlang:

Key Skills and Qualifications

- Mr. Kortlang's work as a venture capitalist with a focus on growth-stage investing in alternative energy technologies provides a valuable industry perspective to the Board. Additionally, Mr. Kortlang's investing and business experience also provides the Board with a valuable perspective on acquisitions and building alternative energy businesses.

Career Highlights

- Mr. Kortlang, 48, has been a Partner with G2VP, LLC, a venture capital firm since August 2016. From February 2008 to April 2020, Mr. Kortlang was a Partner with Kleiner Perkins Caufield & Byers, a venture capital firm. From July 2000 to January 2008, Mr. Kortlang worked with

12

Verified Shareholder Derivative Complaint

Goldman, Sachs & Co., co-heading Goldman's Alternative Energy Investing business. From June 2005 to February 2008, Mr. Kortlang was a Vice President within Goldman's Special Situations Group, before which he was a Vice President in Goldman's investment banking group focusing on Industrials and Natural Resources. From January 1996 to August 1998, Mr. Kortlang was an Associate with A.T. Kearney, Inc., a global management consulting firm where he focused on strategic and operations consulting in the energy, manufacturing, packaging, transportation and communications industries. From February 1993 to July 1994, Mr. Kortlang was a Business Analyst at National Australia Bank in strategic planning and macroeconomic forecasting. Mr. Kortlang served on the Board of Directors of Luminar Technologies, Inc. from 2019 until 2021.

- Mr. Kortlang holds a bachelor of business degree in economics and finance from Royal Melbourne Institute of Technology, a bachelor of commerce and an honors degree in econometrics from University of Melbourne and a master of business administration degree from the University of Michigan.

**Defendant Malchow**

39.    Defendant Malchow has served as a Company director since February 2020. He previously served as a consultant to Enphase from April 2019 to April 2022. According to the 2024 Proxy Statement, as of March 19, 2024, Defendant Malchow beneficially owned 56,616 total shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 19, 2024 was $109.16, Defendant Malchow owned approximately $6,180,203 worth of Enphase stock as of that date.

40.    For Fiscal Year 2023, Defendant Malchow received $309,852 in compensation from the Company. This included $60,000 in fees earned or paid in cash and $249,852 in stock awards.

41.    The 2024 Proxy Statement stated the following about Defendant Malchow:

Key Skills and Qualifications

- Mr. Malchow brings to the Board many years of entrepreneurial and investment experience, with expertise in scaled infrastructure, software-driven businesses, data security and machine learning.

13

Verified Shareholder Derivative Complaint

Career Highlights

- Mr. Malchow, 38, has served as the founding Partner at HNVR Technology Investment Management, a venture capital firm, and has been investing in technology companies since 2013. In 2011, he co-founded Publir LLC, a cloud software company. Mr. Malchow is a member of the board of the National Civic Arts Society in Washington, D.C. From December 2020 through July 2021, he served on the Board of Directors of Rodgers Silicon Valley Acquisition Corp, a special purpose acquisition company that successfully completed a business combination with Enovix Corporation, a lithium-ion battery company. From January 2021 to January 2023, Mr. Malchow served on the Board of Directors of Archaea Energy Inc., a leading producer of renewable gas. Mr. Malchow provided consulting services to Enphase from April 2019 until April 2022. Mr. Malchow is also involved with Stanford University's Freeman-Spogli Institute and Hoover Institution, and with The Federalist Society in Washington, D.C.

- Mr. Malchow holds a bachelor of arts degree from Dartmouth College and a juris doctorate degree from Stanford University.

Current Public Company Boards

- Enovix Corporation (formerly Rodgers Silicon Valley Acquisition Corp.) - since June 2023

**Defendant Mora**

42.     Defendant Mora has served as a Company director since February 2014. He also serves as a member of the Compensation Committee and as a member of the Audit Committee. According to the 2024 Proxy Statement, as of March 19, 2024, Defendant Mora beneficially owned 3,126 total shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 19, 2024 was $109.16, Defendant Mora owned approximately $341,234 worth of Enphase's stock as of that date.

43.     For Fiscal Year 2023, Defendant Mora received $334,852 in compensation from the Company. This included $85,000 in fees earned or paid in cash and $249,852 in stock awards.

Verified Shareholder Derivative Complaint

44.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Mora made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| 2023-05-26 | 1,500 | $165.92 | $248,879 |
| 2024-02-09 | 24,285 | $121.12 | $2,941,520 |

Thus, in total, before the fraud was exposed, he sold 25,785 shares of Company common stock on inside information, for which he received approximately $3.2 million in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

45.     The 2024 Proxy Statement stated the following about Defendant Mora:

Key Skills and Qualifications

- Mr. Mora's expertise in process and productivity improvements at the corporate, regional and country level provides a valuable perspective to the Board, as well as his years of experience with respect to emerging companies, risk management, team building and international operations.

Career Highlights

- Mr. Mora, 59, served as the CEO of Landis+Gyr, an energy management company, from April 2017 through April 2020. Prior to that, Mr. Mora served as the COO of Landis+Gyr, from January 2014 to April 2017. Mr. Mora served as the President and CEO of Landis+Gyr Americas where he had responsibilities for operations in both North and South America, from August 2011 to January 2014. He served as the President and CEO of Landis+Gyr North America, from August 2008 to August 2011.

- Mr. Mora holds a bachelor of arts degree in economics from Stanford University

**Defendant Rodgers**

46.     Defendant Rodgers has served as a Company director since January 2017. He also serves as Chair of the Compensation Committee and as a member of the Nominating

15

Verified Shareholder Derivative Complaint

and Corporate Governance Committee. According to the 2024 Proxy Statement, as of March 19, 2024, Defendant Rodgers beneficially owned 2,398,251 total shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 19, 2024 was $109.16, Defendant Rodgers owned approximately $261,793,079 worth of Enphase stock as of that date.

47.     For Fiscal Year 2023, Defendant Rodgers received $334,852 in compensation from the Company. This included $85,000 in fees earned or paid in cash and $249,852 in stock awards.

48.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Rodgers made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
| --- | --- | --- | --- |
| 2024-05-29 | 319,526 | $126.83 | $40,525,163 |
| 2024-05-30 | 5,188 | $129.60 | $672,344 |

Thus, in total, before the fraud was exposed, he sold 324,714 shares of Company common stock on inside information, for which he received approximately $41.2 million in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

49.     The 2024 Proxy Statement stated the following about Defendant Rodgers:

Key Skills and Qualifications

- Mr. Rodger's brings 35 years of public company CEO experience to the Board. Mr. Rodgers provides an important role in leading the strategic vision of the company.

Career Highlights

- Mr. Rodgers, 76, founded Cypress Semiconductor Corporation in 1982 and served as the President, CEO and as a member of the Board of Directors until April 2017. From September 2020 to July 2021, he served as the Chairman of the Board of Directors and CEO of Rodgers Silicon

16

Verified Shareholder Derivative Complaint

Valley Acquisition Corp., a special purpose acquisition company, that successfully completed a business combination with Enovix Corporation in July 2021, and he continues to serve as the Chairman of the Board of Directors of Enovix Corporation. From January 2017 to January 2023, Mr. Rodgers also served on the Board of Directors of FTC Solar, Inc., a solar tracker company. From May 2002 to May 2011, Mr. Rodgers served as a member of the Board of Directors of SunPower Corporation, an energy company. From June 2004 through December 2012 Mr. Rodgers was a member of the board of trustees of Dartmouth College.

- Mr. Rodgers holds a bachelor of science degree in physics and chemistry from Dartmouth. Mr. Rodgers holds a master of science degree and a Ph.D. in electrical engineering from Stanford University. At Stanford, Mr. Rodgers invented, developed and patented VMOS technology.

Current Public Company Boards
- Enovix Corporation (formerly Rodgers Silicon Valley Acquisition Corp.) - since September 2020
- Complete Solaria - since November 2022

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

50.   By reason of their positions as officers, directors, and/or fiduciaries of Enphase and because of their ability to control the business and corporate affairs of Enphase, the Individual Defendants owed Enphase and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Enphase in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Enphase and its shareholders so as to benefit all shareholders equally.

51.   Each director and officer of the Company owes to Enphase and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

52.   The Individual Defendants, because of their positions of control and authority as directors and/or officers of Enphase, were able to and did, directly and/or indirectly,

Verified Shareholder Derivative Complaint

exercise control over the wrongful acts complained of herein.

53.    To discharge their duties, the officers and directors of Enphase were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

54.    Each Individual Defendant, by virtue of their position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Enphase, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised the Company's Board at all relevant times.

55.    As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained

in compliance with all applicable laws.

56.    To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Enphase were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, California, and the United States, and pursuant to Enphase's corporate governance and applicable codes of conduct and/or ethics;

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how Enphase conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of Enphase and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Enphase's operations would comply with all applicable laws and Enphase's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that

Verified Shareholder Derivative Complaint

the Company was required by law to disseminate;

(g)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

57.    Each of the Individual Defendants further owed to Enphase and the shareholders the duty of loyalty requiring that each favor Enphase's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

58.    At all times relevant hereto, the Individual Defendants were the agents of each other and of Enphase and were at all times acting within the course and scope of such agency.

59.    Because of their advisory, executive, managerial, directorial, and controlling positions with Enphase, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

60.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Enphase.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

61.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The

Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

62.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

63.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Enphase was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

64.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

65.     At all relevant times hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Enphase and was at all times acting

Verified Shareholder Derivative Complaint

within the course and scope of such agency.

## ENPHASE'S CODE OF CONDUCT AND CORPORATE GOVERNANCE

### *Enphase's Code of Conduct*

66.    Enphase's Code of Conduct (the "Code of Conduct") represents that it applies to all of Enphase's and its subsidiaries' employees, directors, and officers, (collectively "Enphase Representatives"), as well as to suppliers, vendors, consultants and business partners (collectively, "Enphase Suppliers") of Enphase and its subsidiaries.

67.    The Code of Conduct states that the Company aims to "conduct business with integrity and to follow ethical and legal business practices worldwide."

68.    In the section "Compliance with Laws, Rules, and Regulations," the Code of Conduct states:

> Enphase Representatives must respect and obey the laws of the cities, states and countries in which Enphase operates.  Enphase Representatives should strive to understand the legal and regulatory requirements applicable to their business units and areas of responsibility and should seek advice from managers or other appropriate individuals in case of any uncertainty. Violation of laws, rules and regulations may subject you, as well as Enphase, to civil and criminal penalties. Each Enphase Supplier must respect, obey and comply with the laws applicable to its business activities.

69.    In the section "Accurate Financial Records," the Code of Conduct states, in relevant part:

> Enphase's financial records must be accurate and complete in all material respects. They must be in compliance with laws and accounting practices. The Finance department is responsible for preparing and reporting Enphase's financial results, but those financial statements are the result of activities, transactions, entries and documents prepared throughout Enphase by many people. Enphase Representatives must make sure all such supporting transactions and documents are complete, accurate, and truthful. Enphase Suppliers will use commercially reasonably efforts to assist Enphase with its compliance objectives under this section. No Enphase Representative or Enphase Supplier may take or authorize any action that would cause our financial records or financial disclosure to fail to comply with generally

accepted accounting principles, the rules and regulations of the Securities and Exchange Commission ("SEC"), and other laws, rules and regulations, or take any action to fraudulently induce, coerce, manipulate or mislead the Finance department or our independent auditors. No Enphase Representative or Enphase Supplier should knowingly allow Enphase to make any false or misleading statement or omit information necessary to make any of Enphase's statements and reports accurate.

70.    Enphase addresses "Insider Trading" within the Code of Conduct in detail, stating:

> All material non-public information about Enphase, our vendors, business partners and customers should be considered confidential, and Enphase Representatives and Enphase Suppliers who have access to such information should use it only for legitimate Enphase business. The use of any material, non-public information to buy stock, or "tip" others, is unethical and illegal.

71.    In the section "Avoid Conflicts of Interest" the Code of Conduct addresses disclosures of conflicts of interest, stating:

> A "conflict of interest" exists when a person's private interest interferes in any way with the interests of Enphase. Conflicts of interest may arise when an Enphase Representative, or a member of their family, receives improper personal benefits as a result of their position with Enphase. A conflict of interest can also arise when an Enphase Representative takes actions or has interests that make it difficult to perform their work objectively and effectively. Conflicts of interest are prohibited, unless specially approved by the Compliance Officer. If you have any questions about a potential conflict of interest or if you become aware of an actual or potential conflict of interest, you should discuss the matter with your manager, HR or Legal. Managers may not authorize conflicts of interest or make determinations as to whether a problematic conflict of interest exists without first seeking the approval of the Compliance Officer. If your manager is involved in the potential or actual conflict of interest, you should contact HR, Legal, or use the Whistleblower Hotline. Any conflict of interest situation involving an executive officer or director, including all loans and guarantees by Enphase involving persons covered by this Code, also requires the authorization of the Audit Committee of the Board of Directors ("Audit Committee").

72.    The Code of Conduct addresses Confidentiality under the heading, "Confidential Information," stating:

23

Verified Shareholder Derivative Complaint

Much of the information to which Enphase Representatives have access to at Enphase is confidential, privileged, or proprietary. Such information should not be disclosed to individuals outside of Enphase, except where required for company-related business and covered by the terms of a Nondisclosure Agreement with the receiving individual or entity. In the course of serving our customers, Enphase Representatives may also learn confidential or proprietary information about them, and it is equally important that Enphase Representatives guard against the disclosure of their confidential information to others. Competitive information must be gathered with care, and not be acquired in ways that are unethical or illegal.

73.     The Code of Conduct addresses Company assets under the heading, "Use of Company Assets and Technological Resources" stating, in relevant part:

All Enphase Representatives and Enphase Suppliers (to the extent applicable) are expected to protect our assets and ensure their efficient use. Theft, carelessness and waste have a direct impact on our profitability. Although reasonable personal use of computer equipment is allowed, as a general rule all Enphase property, facilities and products, are expected to be used only for legitimate business purposes.

74.     In the section "Approvals or Waivers," the Code of Conduct states:

Any approval of conduct prohibited by this Code or any waiver of provisions of this Code requires approval of the Compliance Officer. With respect to Enphase's executive officers or directors, any such approval or waiver also requires authorization by the Audit Committee and may also require public disclosure under SEC rules.

***Enphase's Corporate Governance Guidelines***

75.     The Company also maintains Corporate Governance Guidelines (the "Governance Guidelines"). Under the section titled "Role of the Board of Directors" the Governance Guidelines state:

The Board is selected by the stockholders to provide oversight of, and strategic guidance to, senior management. The core responsibility of a Board member is to fulfill his or her fiduciary duties of care and loyalty and otherwise to exercise his or her business judgment in the best interests of the Company and its stockholders. Service on the Board requires significant time and attention on the part of directors. More specifically, the Board has

24

Verified Shareholder Derivative Complaint

responsibilities to review, approve and monitor fundamental financial and business strategies and major corporate actions, assess major risks facing the Company and consider ways to address those risks, select and oversee management and determine its composition and oversee the establishment and maintenance of processes and conditions to maintain the integrity of the Company. Directors must participate in Board meetings, review relevant materials, serve on committees and prepare for meetings and discussions with management. Directors are expected to maintain an attitude of constructive involvement and oversight; they are expected to ask relevant, incisive and probing questions and require honest and accurate answers. Directors must act with integrity and are expected to demonstrate a commitment to the Company, its values and its business and to long-term stockholder value. Directors are encouraged to attend the Company's annual meeting of stockholders, either in person or telephonically.

76.    The Governance Guidelines outline the functions of each committee within the section titled "Board Committees." Under the sub-heading "Committee Functions" the Governance Guidelines include information regarding the Audit Committee, stating the following, in relevant part:

**Audit Committee**. The Audit Committee oversees the Company's corporate accounting and financial reporting process. For this purpose, the Audit Committee performs several functions. The Audit Committee evaluates the performance of and assesses the qualifications of the independent auditors; determines and approves the scope of the engagement and compensation of the independent auditors; determines whether to retain or terminate the existing independent auditors or to appoint and engage new independent auditors; reviews and approves the retention of the independent auditors to perform any proposed permissible non-audit services; monitors the rotation of partners of the independent auditors on the Company's audit engagement team as required by law; confers with management and the independent auditors regarding the effectiveness of internal controls over financial reporting; establishes procedures, as required under applicable law, for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters and the confidential and anonymous submission by employees of concerns regarding questionable accounting or auditing matters; reviews the financial statements to be included in the Company's Annual Report on Form 10-K; and discusses with management and the independent auditors the results of the annual audit and the results of the Company's quarterly financial statements.

77.     Under the same sub-heading, the Governance Guidelines specifically address the function of the Compensation Committee, stating the following:

The Compensation Committee reviews and approves the overall compensation strategy and policies for the Company. The Compensation Committee reviews and approves corporate performance goals and objectives relevant to the compensation of the Company's executive officers and other senior management; reviews and approves or recommends to the Board for approval the compensation and other terms of employment of the Company's Chief Executive Officer; reviews and approves or recommends to the Board for approval the compensation and other terms of employment of the other executive officers and senior members of management; and administers the Company's equity incentive and stock purchase plans, pension and profit sharing plans, stock bonus plans, deferred compensation plans and other similar programs.

78.     Within the same section, but under the sub-heading "Committee Charters," the Governance Guidelines specifically address committee accountability, stating, in relevant part:

All standing committees will operate pursuant to a written charter, which sets forth the responsibilities of the committee and procedures that the committee will follow. Unless otherwise directed by the Board, new committees formed by the Board will develop a written charter delineating its responsibilities.

79.     The Governance Guidelines discuss director confidentiality compliance under the heading "Board Member Compliance with Confidentiality Obligations" stating, in relevant part:

Delaware law imposes duties of care and loyalty on corporate directors, which includes a duty to protect the confidential information of the Company. In addition, the duty of loyalty prohibits directors from using any proprietary information belonging to the Company for their own personal benefit or the benefit of any person or entity other than the Company. It is essential that directors maintain the confidentiality of all nonpublic information belonging to, entrusted to, or about the Company.

After consulting with the Chief Legal Officer, directors may disclose information covered by confidentiality obligations to the extent authorized by

26

Verified Shareholder Derivative Complaint

the Chairman of the Board or the CEO or as required by law or legal process. All disclosures of non-public information must either (A) be disclosures subject to a confidentiality agreement and that satisfy the SEC's Regulation FD or (B) public disclosures managed in accordance with the Company's communication protocols.

80.    Under the heading, "Chief Executive Officer Evaluation; Succession Planning" the Governance Guidelines state, in relevant part:

The Board should conduct an annual review of the Chief Executive Officer's performance. The evaluation should be based on objective criteria including performance of the business, accomplishment of long-term strategic objectives and the development of management. The evaluation will be used by the Compensation Committee and Board in the course of its deliberations when considering the compensation of the Chief Executive Officer.

81.    In violation of the Code of Conduct and the Governance Guidelines, the Individual Defendants conducted little, if any, oversight of the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including but not limited to breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. Moreover, three of the Individual Defendants violated the Code of Conduct by engaging in insider trading, netting proceeds of *approximately $49.3 million*. Also, in violation of the Governance Guidelines, the Individual Defendants failed to maintain the accuracy of Enphase's records and reports, failed to maintain internal controls, and failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

### *Enphase's Audit Committee Charter*

82.    Enphase also maintains a Charter of the Audit Committee of the Board of Directors (the "Audit Committee Charter") which governs the Audit Committee's roles and responsibilities. The Audit Committee Charter states the following regarding the purpose of the Audit Committee:

27

Verified Shareholder Derivative Complaint

The purpose of the Audit Committee (the "Committee") of the Board of Directors (the "Board") of Enphase Energy, Inc., a Delaware corporation (the "Company"), shall be to (i) monitor and/or assist the Board in monitoring and overseeing (a) the audit, compliance, accounting and financial reporting procedures of the Company, (b) the adequacy of the Company's internal financial controls, and (c) the overall integrity of the Company's financial statements; and (ii) monitor and oversee (x) the selection and independence of the Company's independent registered public accounting firm ("independent auditors") and (y) the management of risks associated with the Company's financial reporting, accounting and auditing matters.

The Committee's function is primarily one of oversight and shall not relieve the responsibilities of the Company's management for preparing financial statements, which accurately and fairly present the Company's financial results and condition, or the responsibilities of the independent auditors relating to the audit or review of financial statements. Nothing in this charter is intended to preclude or impair the protection provided in Section 141(e) of the Delaware General Corporation Law ("DGCL") for good faith reliance by members of the Committee on reports or other information provided by others.

83.   In a section titled "Annual Financial Reporting," the Audit Committee Charter outlines the responsibilities and duties of the Audit Committee, stating the following, in relevant part:

In connection with the audit of each fiscal year's financial statements, the Committee will:

- meet with representatives of the independent auditor prior to the audit to review planning and staffing of the audit;

- review and discuss the audited financial statements and related accounting and auditing principles and practices with appropriate members of the Company's management;

                    *          *          *

- review with appropriate management and auditor representatives their analysis of significant matters which relate to (1) the selection, application and effects of critical accounting policies applied by the Company, (2) internal auditing, financial management and control personnel, systems and procedures, (3) the status of any new, proposed or alternative accounting or financial reporting requirements, and (4) issues raised by

28
Verified Shareholder Derivative Complaint

any management letter from the auditors, difficulties encountered in the audit, disagreements with management, or other significant aspects of the audit;

• receive from the independent auditors a written disclosure and statement of all relationships between the auditors and the Company consistent with Rule 3526 of the PCAOB; • discuss with the auditors any disclosed relationships or services that may impact the objectivity or independence of the auditors and take, or recommend that the full Board take, appropriate action to oversee the independence of the auditor;

• obtain from the independent auditors a statement of the audit fees and other categories of fees billed for the last fiscal year which are required to be disclosed in the Company's proxy statement for its annual meeting under the SEC's proxy rules, and consider whether the provision of any non-audit services is compatible with maintaining the auditors' independence;

\* \* \*

• recommend whether or not the audited financial statements should be included in the Company's Annual Report on Form l0-K for filing with the SEC.

84.    In a section titled "Quarterly Financial Reporting" the Audit Committee Charter delineates responsibilities tied to the Audit Committee's review of interim financial results, stating:

At a Committee meeting or through the Committee chairperson, the Committee will review with the independent auditors and appropriate Company officers the Company's interim financial results to be included in the Company's earnings press releases and on each Form 10-Q. The Committee's review will normally include:

• the results of the independent auditors' review of the quarterly financial statements;

• management's analysis of any significant accounting issues, changes, estimates, judgments or extraordinary items relating to the financial statements; and

• the selection, application and effects of critical accounting policies applied by the Company.

29

Verified Shareholder Derivative Complaint

85.    With respect to internal controls, the Audit Committee Charter states:

The Committee will review at least annually:

- internal control systems and procedures of the Company; the status of management responses to the prior period audit management letter by the independent auditors;

- succession planning and staffing levels for the Company's finance and accounting employees;

- the status and implementation of conduct codes concerning related-party transactions within the meaning of Rule 4-08(k) of Regulation S-X, conflicts of interest, ethical conduct, and compliance with applicable laws and regulatory policies; and

- if the Company has an internal audit function, the internal audit function's responsibilities, budget, and staffing.

86.    With respect to earnings announcements, the Audit Committee Charter states, "The Committee will review and discuss with management and the Auditors any earnings press releases and other financial information and guidance regarding the Company's results of operations provided publicly or to ratings agencies. The Chairperson of the Committee may represent the entire Committee for the purposes of this discussion."

87.    In the section "Risk Assessment and Management," the Audit Committee Charter states, "The Committee will review and discuss with management and, as appropriate, the auditors the Company's major financial risk exposures and the steps taken by management to monitor and control these exposures."

88.    In addition, the Audit Committee Charter outlines other committee responsibilities under the heading "Other Committee Review Function" stating, in relevant part, that "The Committee will establish and oversee procedures for receiving, retaining and treating complaints received by the Company regarding accounting, internal accounting controls or auditing matters and procedures for the confidential, anonymous submission by employees of concerns regarding questionable accounting or auditing matters."

89.    In violation of the Audit Committee Charter, the Individual Defendants

conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of the Exchange Act. Moreover, in violation of the Audit Committee Charter, the Individual Defendants failed to maintain the accuracy of the Company records and reports, comply with laws and regulations, act in good faith and diligence without misstating, misrepresenting, or omitting material facts, and properly report violations of the Audit Committee Charter.

**INDIVIDUAL DEFENDANTS' MISCONDUCT**

**Background**

90.    Enphase is a global energy technology company founded in March 2006 which purports to "design, develop, manufacture and sell home energy solutions that manage energy generation, energy storage and control and communications on one intelligent platform."[5] In recent years, the Company has transitioned from solar only systems to complete energy management solutions, which consist of "solar, batteries, load control, electrical vehicle ('EV') charging, compatibility with third-party generators, and grid services."[6]

91.    Recently, Enphase has expanded its operations globally, causing the Company's revenue from international markets to grow substantially. Indeed, international revenue accounted for approximately 20%, 24%, and 36% of Enphase's total net revenues in fiscal years 2021, 2022, and 2023, respectively.

92.    In recent years, including before the start of the Relevant Period, the European markets for solar products have experienced widespread disruption. Notably, Chinese solar companies have flooded the market for solar inverters by selling or "dumping" their products at prices far lower than market averages, allowing suppliers from China to take

---

[5] https://www.sec.gov/ix?doc=/Archives/edgar/data/1463101/000146310124000024/enph-20231231.htm
[6] *Id.*

Verified Shareholder Derivative Complaint

substantial shares of the market. For example, *Reuters* reported on data from the International Energy Agency which depicted that, in some cases, up to 95% of solar panels and parts installed in the European Union in 2023 came from China.[7]

## FALSE AND MISLEADING STATEMENTS

### April 25, 2023 Announcement of Financial Results and Related Earnings Call

93. The Relevant Period began on April 25, 2023 when the Company announced its financial results for the first quarter of the Fiscal Year 2023 ("1Q23"). Although Enphase disclosed poor Company-wide results, the Company emphasized that "***revenue in Europe increased approximately 25%, compared to the fourth quarter of 2022.***"

94. Later that day, the Company hosted an earnings call with analysts and investors to discuss its 1Q23 financial results. During the call, Defendant Kothandaraman represented that the Company's "European business is growing rapidly" as "sell-through of our microinverters in Europe reached an all-time high" in 1Q23. Also during the call, when asked by an analyst about competition from Chinese companies in Europe and the possible risk that such competition would erode Enphase's margins, Defendant Belur attempted to reassure investors and downplay the risks associated with such competition, stating that "[c]ompetition is strong everywhere" and that competition is "nothing new." He also stated that the Company's value proposition was to provide "highly differentiated products, high-reliability products and great customer experience[,]" all of which Defendant Belur claimed justified the Company having higher prices than its competitors. Later, Defendant Kothandaraman was asked by an analyst whether the Company would need to make a "trade-off between price and volume" since "installers may be prioritizing cost." In response, he asserted that such a trade off would not be necessary since the Company's "high quality leads to high price" and installers "understand it is not about just the price of the inverter," but "the entire cost of ownership."

95. Defendant Kothandaraman continued, suggesting that Enphase does not "see

---

[7] *See* Kate Abnett and Nina Chestney, *With solar industry in crisis, Europe in a bind over Chinese imports*, REUTERS, Feb. 6, 2024, https://www.reuters.com/business/energy/with-solar-industry-crisis-europe-bind-over-chinese-imports-2024-02-06/.

Verified Shareholder Derivative Complaint

any drop in [Enphase's] pricing" in Europe. He also emphasized that Enphase performs "value-based pricing, which is basically pric[ing] products based upon the value they bring compared to the next best alternative."

### *May 11, 2023 Announcement from SMA*

96.    On May 11, 2023, SMA Solar Technology AG ("SMA"), one of the Company's Germany-based competitors, hosted an earnings call with analysts and investors to discuss its financial results for 1Q23. During the call, when asked about the competition that SMA had experienced and the resulting effects on SMA's pricing from Chinese companies dumping solar inverters in Europe, SMA's CFO explained that SMA "seriously" monitors price developments in the market and noted that "we could expect or will expect slight reductions going forward."

### *June 20, 2023 Guggenheim Report*

97.    On June 20, 2023, after participating in a solar energy conference in Munich, Germany, analysts at Guggenheim issued a report discussing competition in the European inverter market. Notably, Guggenheim had spoken with one of the Company's biggest competitors, SolarEdge, who represented that it was feeling "competitive pressure from Chinese competitors" and acknowledged that "Chinese inverter vendors in Europe are no longer just selling trailing-edge technology at low prices," but are now selling technologically advanced products as well. Based on the foregoing, Guggenheim reported that its analysts "think it makes sense that [SolarEdge] regards the[] [Chinese competitors] as the primary threat [in Europe]." With respect to Enphase's business in Europe, Guggenheim reported that they "agree with the many industry participants [they] spoke to which observed that ***[Enphase]'s existing price points are too high for most of Europe***" and that "***it's going to be difficult for [Enphase] to maintain its growth in Europe***, or take share in Germany, ***without offering significant concessions***."

### *July 27, 2023 Announcement of Financial Results and Related Earnings Call*

98.    On July 27, 2023, the Company announced its financial results for the second

Verified Shareholder Derivative Complaint

quarter of the Fiscal Year 2023 ("2Q23"), revealing, among other things, that "revenue in Europe increased approximately 25%, compared to the first quarter of 2023." Later that day, the Company hosted an earnings call with analysts and investors to discuss its 2Q23 financial results. During the call, Defendant Kothandaraman touted Enphase's "strong broad-based growth across Europe," representing that markets in the Netherlands and France were "very strong" and, further, that Enphase was gaining "real traction" in Germany. Defendant Kothandaraman also told investors that "we see increasingly complex power markets and home energy management needs playing right into our strengths" and that the Company's "quality and service . . . will help strengthen our market position."

99.     The statements in ¶¶93-95 and ¶98 above were materially false and misleading and failed to disclose, *inter alia*, that: (1) Enphase was facing competitive threats in the European solar inverter market, particularly due to pressure from suppliers in China; (2) due to the foregoing, Enphase could not maintain a sound pricing strategy; and (3) the foregoing factors would have a material detrimental impact on the Company's financial statements. Specifically, the Individual Defendants systematically overstated Enphase's ability to maintain its pricing levels and market share for microinverter products in Europe given competition from low-cost alternatives. As a result of the foregoing, the Company's statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

**The Truth Begins to Emerge As the False and Misleading Statements Continue**

100.    The truth began to emerge after the market closed on October 26, 2023, when Enphase disclosed its financial results for the third quarter of Fiscal Year 2023. In pertinent part, Enphase reported that "revenue in Europe decreased approximately 34%, compared to the second quarter of 2023 due to . . . softening in demand in our key markets – the Netherlands, France, and Germany."

101.    During an earnings call Enphase hosted the same day to discuss these results, Defendant Kothandaraman explained that the Company suffered from poor sell-through of

34

Verified Shareholder Derivative Complaint

its products in the Netherlands—Enphase's largest European market—due to temporary "confusion" related to regulatory changes in the solar industry. He also represented that the 34% quarter-over-quarter decrease in sell-through of the Company's products in France was "driven by seasonality." In addition, while acknowledging that installers "do want to take advantage of the lowest cost available" and "may want to switch to somebody who's offering low cost," Defendant Kothandaraman emphasized that, despite competitive headwinds, Enphase would not be altering its strategy for pricing, stating that "there's no broad-based pricing adjustment from us."

102. On this news, the price per share of the Company's stock fell $14.09, or approximately 15%, from a closing price of $96.18 per share on October 26, 2023 to close at $82.09 per share on October 27, 2023.

103. Still, despite Enphase's disappointing sales performance in Europe, Defendants continued to mislead investors regarding the impact of increased competition in the European microinverter market, repeatedly representing that Enphase would be able to maintain its market share and its price levels.

***February 6, 2024 Announcement of Financial Results and Related Earnings Call***

104. On February 6, 2024, the Company disclosed its financial results for the fourth quarter of Fiscal Year 2024, informing investors that "revenue in Europe decreased approximately 70%, compared to the third quarter of 2023" as a result of a "further softening in demand." Later, during the earnings call Enphase held with analysts and investors to discuss these results, Defendant Kothandaraman stated, *inter alia*, that Germany's landscape was "tricky" and that the Netherlands continued to be affected by regulatory "confusion." Moreover, Defendant Kothandaraman downplayed Enphase's 1% quarter-over-quarter sales decline in France, stating that "as far as France is concerned, we see stready demand in France" and that "[u]tility rates are increasing in France . . . [s]o we think that's a general positive." Notably, Defendants failed to mention competition from China at all as a reason for Enphase's disappointing performance.

105. Later on the call, when asked again about Enphase's pricing strategy in light of increased competition, Defendant Kothandaraman stated that "high quality for me is high price" and "we have the ability to demand the premium." He also reassured investors that "even with those high prices, . . . our market share is very healthy" and that he did not "believe that we will need to drop pricing in order to gain market share."

106. The statements in ¶¶104-105 above were materially false and misleading and failed to disclose, *inter alia*, that: (1) Enphase was facing competitive threats in the European solar inverter market, particularly due to pressure from suppliers in China; (2) due to the foregoing, Enphase could not maintain a sound pricing strategy; and (3) the foregoing factors would have a material detrimental impact on the Company's financial statements. Specifically, the Individual Defendants systematically overstated Enphase's ability to maintain its pricing levels and market share for microinverter products in Europe given competition from low-cost alternatives. As a result of the foregoing, the Company's statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### April 4, 2024 Proxy Statement

107. On April 4, 2024, the Company filed the 2024 Proxy Statement with the SEC. Defendants Kothandaraman, Gomo, Haenggi, Kortlang, Malchow, Mora, and Rodgers solicited the 2024 Proxy Statement, filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

108. The 2024 Proxy Statement called for Company shareholders to vote to, *inter alia*: (1) re-elect Defendants Kothandaraman and Malchow to the Board; (2) approve, on an advisory basis, the compensation of Enphase's named executive officers; and (3) ratify the selection of Deloitte & Touche LLP as the Company's independent registered public accounting firm for fiscal year ending December 31, 2024 (the "Fiscal Year 2024").

109. With respect to the Company's Code of Conduct, the 2024 Proxy Statement stated:

Verified Shareholder Derivative Complaint

We have adopted the Enphase Energy Code of Conduct ("Code of Conduct") that applies to all officers, directors and employees. The Code of Conduct is available on our website at *https://investor.enphase.com/corporate-governance*. If we make any substantive amendments to the Code of Conduct or grant any waiver from a provision of the Code of Conduct to any executive officer or director, we intend to promptly disclose the nature of the amendment or waiver on our website.

110. Regarding the "Role of the Board in Risk Oversight," the 2024 Proxy Statement stated the following, in relevant part:

One of the Board's key functions is informed oversight of our risk management process. The Board does not have a standing risk management committee, but rather administers this oversight function directly through the Board as a whole, as well as through various Board standing committees that address risks inherent in their respective areas of oversight. In particular, the Board is responsible for monitoring and assessing strategic risk exposure, including a determination of the nature and level of risk appropriate for Enphase. The Audit Committee has the responsibility to consider and discuss our major financial and accounting risk exposures and the steps our management has taken to monitor and control these exposures, including guidelines and policies to govern the process by which risk assessment and management is undertaken. The Audit Committee also monitors compliance with legal and regulatory requirements, as well as the performance of our internal audit function. The Audit Committee responsibilities also include oversight of cybersecurity risk management, including an annual review of our IT security. The Nominating and Corporate Governance Committee oversees the risks associated with Board and corporate governance, director independence and our human capital and sustainability initiatives. The Compensation Committee assesses and monitors whether any of our compensation policies and programs has the potential to encourage excessive risk-taking. Each of our committees provides reports to the full Board on their oversight activities and escalates review of risk issues to the Board as appropriate. In addition, the Board meets with certain members of our executive team, including the heads of our different organizational functions, who discuss the risks and exposures involved in their respective areas of responsibility as well as any developments that could impact our risk profile or other aspects of our business. These reports from our executive team are designed to provide timely visibility to the Board and its committees about the identification and assessment of key risks, our risk mitigation strategies and ongoing developments.

Verified Shareholder Derivative Complaint

111.    With respect to the Audit Committee's oversight responsibility, the 2024 Proxy Statement stated:

The Audit Committee also has the following responsibilities:

•determining whether to retain or terminate the existing independent auditors or to appoint and engage new independent auditors;

•reviewing and approving the retention of the independent auditors to perform any proposed permissible non-audit services;

•reviewing and approving or rejecting related-party transactions;

•*oversight of cybersecurity risks;*

•*oversight of our enterprise risk management program*; and

•reviewing and discussing with management and the independent registered public accounting firm our annual audited and quarterly financial statements, the results of the independent audit and the quarterly reviews, and the reports and certifications regarding internal control over financial reporting and disclosure controls.

112.    Defendants Kothandaraman, Gomo, Haenggi, Kortlang, Malchow, Mora, and Rodgers caused the 2024 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) Enphase was facing competitive threats in the European solar inverter market, particularly due to pressure from suppliers in China; (2) due to the foregoing, Enphase could not maintain a sound pricing strategy; and (3) the foregoing factors would have a material detrimental impact on the Company's financial statements. Specifically, the Individual Defendants systematically overstated Enphase's ability to maintain its pricing levels and market share for microinverter products in Europe given competition from low-cost alternatives. As a result of the foregoing, the Company's statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

Verified Shareholder Derivative Complaint

113. The 2024 Proxy Statement was also false and misleading because, despite assertions to the contrary, the Company's Code of Conduct and the Audit Committee Charter were not followed, as evidenced by the Individual Defendants: (1) making and/or causing the Company to make the numerous false and misleading statements and omissions alleged herein; and (2) failing to report violations of the Code of Conduct. Further, the 2024 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Board was not adequately performing its risk oversight functions.

114. As a result of Defendants Kothandaraman, Gomo, Haenggi, Kortlang, Malchow, Mora, and Rodgers causing the 2024 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) re-elect Defendants Kothandaraman and Malchow to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; (2) approve, on an advisory basis, the compensation of Enphase's named executive officers; and (3) ratify the selection of Deloitte & Touche LLP as the Company's independent registered public accounting firm for Fiscal Year 2024.

***April 23, 2024 Announcement of Financial Results***

115. On April 23, 2024, the Company reported its financial results for the first quarter of Fiscal Year 2024, stating that "revenue in Europe increased approximately 70%, compared to the fourth quarter of 2023." Later, during the accompanying earnings call Enphase hosted with analysts and investors to discuss these results, Defendant Kothandaraman represented that the Company was "encouraged by the demand signals we are seeing" in the Netherlands after receiving some clarity in the regulatory landscape and was "encouraged by the continued strength" in France "supported by higher utility rates," and that, in Germany, sell-through of the Company's products "was up 28% compared to Q4." He also stated that the Company was growing market share in Europe due to "highlighting our value" to installers, representing that Enphase's relationships with installers were the "single most [significant] reason" that Enphase had been able to increase its market share.

Verified Shareholder Derivative Complaint

116. Analysts expressed skepticism with respect to the Company's representations, with Guggenheim reporting that the Company's "current recovery in some European markets notwithstanding, we think that the medium-term trajectory in Europe is clear, and that trajectory is market share gain by Chinese suppliers." They also reported that they "don't doubt [Enphase's] technical superiority – what we doubt is the [C]ompany's ability to capitalize on its advantages in European markets that are undergoing rapid price deflation" caused by suppliers from China.

*July 23, 2024 Announcement of Financial Results and Related Earnings Call*

117. On July 23, 2024, the Company reported its financial results for the second quarter of Fiscal Year 2024, announcing that "revenue in Europe for the second quarter of 2024 remained flat when compared to the first quarter of 2024." Later, during the accompanying earnings call with analysts and investors, Defendant Kothandaraman again represented that the Netherlands was being affected by "regulatory uncertainty" and that France had been facing obstacles associated with unfavorable utility rate spreads.

118. The statements in ¶¶115 and 117 above were materially false and misleading and failed to disclose, *inter alia*, that: (1) Enphase was facing competitive threats in the European solar inverter market, particularly due to pressure from suppliers in China; (2) due to the foregoing, Enphase could not maintain a sound pricing strategy; and (3) the foregoing factors would have a material detrimental impact on the Company's financial statements. Specifically, the Individual Defendants systematically overstated Enphase's ability to maintain its pricing levels and market share for microinverter products in Europe given competition from low-cost alternatives. As a result of the foregoing, the Company's statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## The Truth Fully Emerges

119. The truth regarding the Company's competitive positioning in Europe fully emerged on October 22, 2024 when the Company announced its financial results for the

Verified Shareholder Derivative Complaint

third quarter of 2024, revealing, *inter alia*, that "revenue in Europe decreased approximately 15% for the third quarter of 2024, compared to the second quarter of 2024" due to "further softening in European demand."

120.   Later that day, the Company hosted an earnings call with analysts and investors to discuss these results. On the call, Defendant Kothandaraman stated that "[w]hile every country in Europe has its nuances, the overall business environment in the region is challenging." Notably, he failed to make any mention of competition the Company was facing from Chinese companies and emphasized that Enphase was "not dropping pricing anywhere" despite consistent competitive headwinds.

121.   Analysts responded negatively to these disclosures, with Guggenheim downgrading the Company's stock from a neutral rating to a sell rating and reporting that Enphase was "losing share to Chinese competitors who are willing to sell at less than half [Enphase]'s level" in Europe. In particular, Guggenheim reported that "[t]his is a story that became abundantly clear during our meetings at [a clean energy conference] earlier this year, and we find it remarkable that the company managed to get through the entire call yesterday without once mentioning the competitive environment in Europe." It also reported that the Company "***in Europe***, like many growth-forcused technology companies before it, ***is now overshooting what its customers actually want or need, and is being undercut by still-inferior but improving Chinese product***."

122.   On this news, the price per share of the Company's common stock fell $13.76, or approximately 15%, from a closing price of $92.23 per share on October 22, 2024 to close at $78.47 per share on October 23, 2024.

## REPURCHASES DURING THE RELEVANT PERIOD

123.   During the Relevant Period, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company. In total, the Company spent an aggregate amount of over $601.6 million to repurchase approximately 4.9 million shares of its own common stock at the average price of $122.78,

at thus artificially inflated prices, from April 2023 through October 2024.

124. As the Company's stock was actually worth only $78.47 per share, the price at which it was trading when markets closed on October 23, 2024, the Company overpaid for repurchases of its own stock by over $210 million in total. over $210

**DAMAGES TO ENPHASE**

125. As a direct and proximate result of the Individual Defendants' conduct, Enphase has lost and will continue to lose and expend many millions of dollars.

126. Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

127. Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

128. Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

129. Such losses include the Company's overpayment of over $210 million for repurchases of its own stock during the period when the Company's stock price was artificially inflated due to the false and misleading statements discussed herein.

130. Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

131. As a direct and proximate result of the Individual Defendants' conduct, Enphase has also suffered and will continue to suffer a loss of reputation and goodwill, and

a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations.

## DERIVATIVE ALLEGATIONS

132.    Plaintiff brings this action derivatively and for the benefit of Enphase to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Enphase, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of Sections 14(a), 10(b), and 20(a) of the Exchange Act, as well as for contribution under Sections 10(b) and 21D of the Exchange Act against Defendants Kothandaraman and Belur.

133.    Enphase is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

134.    Plaintiff is, and has been at all relevant times, a shareholder of Enphase. Plaintiff will adequately and fairly represent the interests of Enphase in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

135.    Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

136.    A pre-suit demand on the Board is futile and, therefore, excused. When this action was filed, Enphase's Board consisted of the following seven individuals: Defendants Kothandaraman, Gomo, Haenggi, Kortlang, Malchow, Mora, and Rodgers (the "Director-Defendants"). Plaintiff needs only to allege demand futility as to four of the seven Director-Defendants that were on the Board at the time this action was filed.

137.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to

43

Verified Shareholder Derivative Complaint

make false and misleading statements and omissions of material fact, and, at the same time, to cause the Company to overpay by over $210 million for repurchases of its own stock while the stock price was artificially inflated due to the false and misleading representations discussed herein, all of which renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

138.    Moreover, all of the Director-Defendants solicited the false and misleading 2024 Proxy Statement to call for a shareholder vote to, *inter alia*, re-elect Defendants Kothandaraman and Malchow to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company.

139.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted Enphase to issue materially false and misleading statements. Specifically, the Director-Defendants caused Enphase to issue false and misleading statements which were intended to make Enphase appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

140.    Additional reasons that demand on Defendant Kothandaraman is futile follow. Defendant Kothandaraman has served as President and CEO of Enphase and as a Company director since September 2017. Previously, he served as the Company's COO from April 2017 to September 2017. The Company provides Defendant Kothandaraman with his principal occupation, for which he receives handsome compensation, including over $19 million for Fiscal Year 2023. Thus, as the Company admits, he is a non-independent director. As the Company's highest officer and an influential member of the Board, Defendant Kothandaraman was ultimately responsible for the issuance of all of the false and misleading statements made during the Relevant Period. Defendant Kothandaraman

Verified Shareholder Derivative Complaint

also solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to the re-election of himself and Defendant Malchow to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. As the Company's highest officer, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein. Moreover, Defendant Kothandaraman is named as a defendant in the Securities Class Action. For these reasons, Defendant Kothandaraman breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

141. Additional reasons that demand on Defendant Gomo is futile follow. Defendant Gomo has served as a Company director since March 2011. He also serves as Chair of the Board and as Chair of the Audit Committee. Defendant Gomo has received and continues to receive handsome compensation for his role as a director, including $374,991 in Fiscal Year 2023. Defendant Gomo also solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Kothandaraman and Malchow to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. As trusted Chair of the Board and Chair of the Audit Committee, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Additionally, during the Relevant Period and while the price of the Company's common stock was artificially inflated due to the misrepresentations alleged herein, Defendant Gomo engaged in lucrative insider trading, obtaining personal profits of approximately $4.9 million. These insider sales further

demonstrate his motive in participating in the scheme. For these reasons too, Defendant Gomo breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and therefore, excused.

142. Additional reasons that demand on Defendant Haenggi is futile follow. Defendant Haenggi has served as a Company director since August 2020. She also serves as a member of the Nominating and Corporate Governance Committee. Defendant Haenggi has received and continues to receive handsome compensation for her role as a director, including $314,852 in Fiscal Year 2023. Defendant Haenggi also solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Kothandaraman and Malchow to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons too, Defendant Haenggi breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and therefore, excused.

143. Additional reasons that demand on Defendant Kortlang is futile follow. Defendant Kortlang has served as a Company director since May 2010. He also serves as Chair of the Nominating and Corporate Governance Committee and as a member of the Audit Committee. Defendant Kortlang has received and continues to receive handsome compensation for his role as a director, including $334,852 in Fiscal Year 2023. Defendant Kortlang also solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Kothandaraman and Malchow to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously

Verified Shareholder Derivative Complaint

disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons too, Defendant Kortlang breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and therefore, excused.

144. Additional reasons that demand on Defendant Malchow is futile follow. Defendant Malchow has served as a Company director since February 2020. He also previously served as a consultant to Enphase from April 2019 to April 2022. Thus, as the Company admits, he is a non-independent director. Defendant Malchow has received and continues to receive handsome compensation for his role as a director, including $309,852 in Fiscal Year 2023. Defendant Malchow also solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to the re-election of himself and Defendant Kothandaraman to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons too, Defendant Malchow breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and therefore, excused.

145. Additional reasons that demand on Defendant Mora is futile follow. Defendant Mora has served as a Company director since February 2014. He also serves as a member of the Compensation Committee and Audit Committee. Defendant Mora has received and continues to receive handsome compensation for his role as a director, including $334,852 in Fiscal Year 2023. Defendant Mora solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Kothandaraman and Malchow to the Board, thereby allowing them

to continue breaching their fiduciary duties to the Company. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Additionally, during the Relevant Period and while the price of the Company's common stock was artificially inflated due to the misrepresentations alleged herein, Defendant Mora engaged in lucrative insider trading, obtaining personal profits of approximately $3.2 million. These insider sales further demonstrate his motive in participating in the scheme. For these reasons too, Defendant Mora breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and therefore, excused.

146.    Additional reasons that demand on Defendant Rodgers is futile follow. Defendant Rodgers has served as a Company director since January 2017. He also serves as Chair of the Compensation Committee and as a member of the Nominating and Corporate Governance Committee. Defendant Rodgers has received and continues to receive handsome compensation for his role as a director, including $334,852 in Fiscal Year 2023. Defendant Rodgers also solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Kothandaraman and Malchow to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Additionally, during the Relevant Period and while the price of the Company's common stock was artificially inflated due to the misrepresentations alleged herein, Defendant Rodgers engaged in lucrative insider trading, obtaining personal profits of approximately $41.2 million. These insider sales further demonstrate his motive in

Verified Shareholder Derivative Complaint

participating in the scheme. For these reasons too, Defendant Rodgers breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and therefore, excused.

147.   Additional reasons that demand on the Board is futile follow.

148.   Defendants Gomo, Kortlang, and Mora (collectively, the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and the Code of Conduct. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

149.   In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In further violation of the Code of Conduct, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

150.   Enphase has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or any others who were responsible for that wrongful conduct to attempt to recover for Enphase any part of the damages Enphase suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

151.   The Director-Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

152.   The acts complained of herein constitute violations of fiduciary duties owed by Enphase's officers and directors, and these acts are incapable of ratification.

153.   The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Enphase. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Enphase, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring

such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

154. If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Enphase to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

155. Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least four of the Director-Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM
### Against the Individual Defendants for Violations of
### Section 14(a) of the Exchange Act

156. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

157. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

158. Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material

fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

159.    Defendants Haenggi, Kortlang, Mora, Kothandaraman, Malchow, Gomo, and Rodgers caused the 2024 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) Enphase was facing competitive threats in the European solar inverter market, particularly due to pressure from suppliers in China; (2) due to the foregoing, Enphase could not maintain a sound pricing strategy; and (3) the foregoing factors would have a material detrimental impact on the Company's financial statements. Specifically, the Individual Defendants systematically overstated Enphase's ability to maintain its pricing levels and market share for microinverter products in Europe given competition from low-cost alternatives. As a result of the foregoing, the Company's statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

160.    Under the direction and watch of Defendants Haenggi, Kortlang, Mora, Kothandaraman, Malchow, Gomo, and Rodgers, the 2024 Proxy Statement also failed to disclose, *inter alia*, that: (1) though the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2024 Proxy Statement's description of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

161.    In the exercise of reasonable care, the Individual Defendants should have known that, by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2024 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2024 Proxy Statement, including, but not limited to, the reelection of the Company's directors.

162. As a result of Defendants Kothandaraman, Gomo, Haenggi, Kortlang, Malchow, Mora, and Rodgers causing the 2024 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) re-elect Defendants Kothandaraman and Malchow to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; (2) approve, on an advisory basis, the compensation of Enphase's named executive officers; and (3) ratify the selection of Deloitte & Touche LLP as the Company's independent registered public accounting firm for Fiscal Year 2024.

163. The Company was damaged as a result of Defendants Haenggi's, Kortlang's, Mora's, Kothandaraman's, Malchow's, Gomo's, and Rodgers's material misrepresentations and omissions in the 2024 Proxy Statement.

164. Plaintiff, on behalf of Enphase, has no adequate remedy at law.

## SECOND CLAIM
### Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act

165. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

166. The Individual Defendants, by virtue of their positions with Enphase and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Enphase and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause Enphase to engage in the illegal conduct and practices complained of herein.

167. Plaintiff, on behalf of Enphase, has no adequate remedy at law.

## THIRD CLAIM
### Against the Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Exchange Act

168. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

Verified Shareholder Derivative Complaint

169. The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding Enphase. Not only is Enphase now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon Enphase by the Individual Defendants. With the price of its common stock trading at artificially inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase *more than 4.9 million* of its own shares at artificially inflated prices, damaging Enphase.

170. During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and practiced in a continuous course of conduct designed to falsify the Company's press releases, public statements made in conference calls, and periodic and current reports filed with the SEC.

171. The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Enphase not misleading.

172. The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as officers and directors of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by Enphase.

173. The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the scheme and the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in

Verified Shareholder Derivative Complaint

that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

174.   By virtue of the foregoing, the Individual Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

175.   Plaintiff, on behalf of Enphase, has no adequate remedy at law.

### FOURTH CLAIM
### Against the Individual Defendants for Breach of Fiduciary Duties

176.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

177.   Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Enphase's business and affairs.

178.   Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

179.   The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Enphase.

180.   In breach of their fiduciary duties owed to Enphase, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) Enphase was facing competitive threats in the European solar inverter market, particularly due to pressure from suppliers in China; (2) due to the foregoing, Enphase could not maintain a sound pricing strategy; and (3) the foregoing factors would have a material detrimental impact on the Company's financial statements. Specifically, the Individual

Verified Shareholder Derivative Complaint

Defendants systematically overstated Enphase's ability to maintain its pricing levels and market share for microinverter products in Europe given competition from low-cost alternatives. As a result of the foregoing, the Company's statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

181. In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced herein, which renders them personally liable to the Company for breaching their fiduciary duties.

182. In yet further breach of their fiduciary duties, during the Relevant Period, the Individual Defendants willfully or recklessly caused the Company to repurchase millions of shares of its own common stock at artificially inflated prices before the fraud was exposed, while three of the Individual Defendants engaged in lucrative insider sales, netting proceeds of approximately $49.3 million.

183. Also, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

184. The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Enphase's securities.

185. The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the

56

Verified Shareholder Derivative Complaint

Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Enphase's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

186. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

187. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Enphase has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

188. Plaintiff, on behalf of Enphase, has no adequate remedy at law.

## FIFTH CLAIM
### Against the Individual Defendants for Unjust Enrichment

189. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

190. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Enphase.

191. The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Enphase that was tied to the performance or artificially inflated valuation of Enphase, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct. This includes lavish compensation, benefits, and other payments provided

to the Individual Defendants who breached their fiduciary duties to the Company.

192. Plaintiff, as a shareholder and a representative of Enphase, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

193. Plaintiff, on behalf of Enphase, has no adequate remedy at law.

## SIXTH CLAIM
### Against the Individual Defendants for Abuse of Control

194. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

195. The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Enphase, for which they are legally responsible.

196. As a direct and proximate result of the Individual Defendants' abuse of control, Enphase has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

197. Plaintiff, on behalf of Enphase, has no adequate remedy at law.

## SEVENTH CLAIM
### Against the Individual Defendants for Gross Mismanagement

198. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

199. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Enphase in a manner consistent with the operations of a publicly held corporation.

200. As a direct and proximate result of the Individual Defendants' gross

Verified Shareholder Derivative Complaint

mismanagement and breaches of duty alleged herein, Enphase has sustained and will continue to sustain significant damages.

201. As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

202. Plaintiff, on behalf of Enphase, has no adequate remedy at law.

## EIGHTH CLAIM
### Against the Individual Defendants for Waste of Corporate Assets

203. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

204. The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

205. As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Enphase to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

206. In addition, the Individual Defendants caused the Company to repurchase millions of shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

207. As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

208. Plaintiff, on behalf of Enphase, has no adequate remedy at law.

## NINTH CLAIM
### Against Defendants Kothandaraman and Belur for Contribution Under Sections 10(b) and 21D of the Exchange Act

209. Plaintiff incorporates by reference and re-alleges each and every allegation set

forth above, as though fully set forth herein.

210. Enphase and Defendants Kothandaraman and Belur are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendant Kothandaraman's and Defendant Belur's willful and/or reckless violations of their obligations as officers and/or directors of the Company.

211. Defendants Kothandaraman and Belur, because of their positions of control and authority as officers and/or directors of the Company, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts complained of herein and in the Securities Class Action.

212. Accordingly, Defendants Kothandaraman and Belur are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

213. As such, Enphase is entitled to receive all appropriate contribution or indemnification from Defendants Kothandaraman and Belur.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a) Declaring that Plaintiff may maintain this action on behalf of Enphase, and that Plaintiff is an adequate representative of the Company;

(b) Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Enphase;

(c) Determining and awarding to Enphase the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and

Verified Shareholder Derivative Complaint

severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Enphase and the Individual Defendants to take all necessary actions to reform and improve Enphase's corporate governance and internal procedures to comply with applicable laws and to protect Enphase and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws and/or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1.  a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2.  a provision to permit the shareholders of Enphase to nominate at least four candidates for election to the Board;

3.  a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

(e)    Awarding Enphase restitution from Individual Defendants, and each of them;

(f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)    Granting such other and further relief as the Court may deem just and proper.

//

//

//

//

//

Verified Shareholder Derivative Complaint

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.


Dated: January 17, 2025                    Respectfully submitted,

                                           **THE BROWN LAW FIRM, P.C.**

                                                   */s/Robert C. Moest*
                                           Robert C. Moest, Of Counsel, SBN 62166
                                           2530 Wilshire Boulevard, Second Floor
                                           Santa Monica, CA 90403
                                           Telephone: (310) 915-6628
                                           Facsimile: (310) 915-9897
                                           Email: RMoest@aol.com

                                           **THE BROWN LAW FIRM, P.C.**
                                           Timothy Brown
                                           767 Third Avenue, Suite 2501
                                           New York, NY 10017
                                           Telephone: (516) 922-5427
                                           Facsimile: (516) 344-6204
                                           Email: tbrown@thebrownlawfirm.net

                                           *Attorneys for Plaintiff*

Verified Shareholder Derivative Complaint

## **VERIFICATION**

I, Greg Hanowski, am a plaintiff in the within action.  I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this GH__ day of January, 2025.

Signed by:

*Greg Hanowski*

A9CE68CB5A6141E...

Greg Hanowski